

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

United States of America

      Plaintiff

      V.



Case No.

5:15-cr-20040

Jimmy Joseph McWherter

      Petitioner

<u>Supplement To The Motion For Court Order</u>

<u>Granting Immediate Release To Home Confinement</u>

<u>Pursuant To The CARES ACT And Compassionate Release</u>

In other cases where inmates are requesting immediate release to home confinement for the balance of their sentences, the government has taken consistent positions. The Petitioner, desiring to save this court time and effort, is providing additional information and clarification on his position.

Government's position: The Petitioner must exhaust his administrative remedy process in order for the court to have jurisdiction.

Petitioner's position: Attached please find the Warden's denial for compassionate release. (See exhibit 1).

1

Government's position: This court has no jurisdiction to rule in this matter.

Petitioner's position: Petitioner has provided over 50 different cases where courts have ruled and granted the immediate release to home confinement of other at risk inmates and in some cases sentences were reduced to time served. This in of itself demonstrates that the Federal Courts do have jurisdiction over these cases to either reduce the sentence or direct the BOP to place inmates in home confinement pursuant to 3582(c)(1)(A) after considering section 3553(a) factors. There are many, many more of these cases and every day more and more judges are ruling the immediate release to home confinement for BOP inmates. The following are 26 new cases where Judges have ordered either transfer to home confinement for the balance of an inmate's sentence or time served. These cases are all new since the Petitioner originally filed his motion.

United States v Moore No. 3:16-CR-00171 (D. Ore. May 21, 2020)
United States v Stephenson No. 3:05-CR-0051 (S.D. Iowa May 21, 2020)
United States v Galloway No. RBD-10-0775 (E.D. Mich. May 21, 2020)
United States v Parker No. 2:98-CR-00749 (C.D. Cal. May 21, 2020)
United States v Rahim No. 16-20433 (E.D. Mich May 21, 2020)
United States v Readus No. 16-20827-1 (E.D. Mich. May 21, 2020)
United States v Vence-Small No. 3:18-CR-00031 (JAM)(D. Conn. May 21, 2020)
United States v Pippin No. CR 16-0266 (W.D. Wash. May 20, 2020)
United States v Schneider No. 14-cr-30036 (C.D. Ill May 20, 2020)
United States v Doshi No. 13-CR-20349 (E.D. Mich May 20, 2020)
United States v White No. 13-CR-20653-1 (E.D. Mich May 20, 2020)
United States v Hill No. 3:19-CR-00038 (JAM)(D. Conn. May 19, 2020)
United States v Dorsey No. CR-16-0138-BLW-JCC (W.D. Wash May 19, 2020)

United States v Sarkisyan No. 15-CR-00234-CRB-15 (N.D. Cal. May 19, 2020)
United States v Bright No. 2:15-CR-00015-005 (W.D. VA May 19, 2020)
United States v El Hanafi No. 10-CR-162 (KMW)(S.D. NY May 19, 2020)
United States v Copeland No. 02-CR-01120(FB)(ED NY May 19, 2020)
United States v Bischoff No. 17-CR-196-JD (D NH May 18, 2020)
United States v Anderson No 15-CR-30115 (CD Ill May 18, 2020)
United States v Rountree No. 1:12-CR-0308(LEK)(ND NY May 18, 2020)
United States v Cotinola No 13-CR-03890-MV(D. N.M. May 18, 2020)
United States v Bennett No. 05-CR-1192-1 (NRB)(SD NY May 18, 2020)
United States v Agomuch No. 16-20196(ED Mich May 18, 2020)
United States v Schafer No. 6:18-CR-06152 EAW (W D NY May 18, 2020)
United States v Johnson No 15-CR-125(KBJ)(DDC May 16, 2020)
United States v Arreola-Bretado No. 3:19-CR-034100-BTM-(SD Cal May 16, 2020)


Government's position: The BOP has determined that Plaintiff is a "danger to the community".


Petitioner's position: Petitioner is currently incarcerated in a camp, the lowest possible custody level. The camp has no fences and no cells. If the government considered the Petitioner to be a "danger to the community" it would never have allowed Petitioner to be in a camp.


Government's position: It is safer for the Plaintiff in Loretto than at his home.


Petitioner's position: Per the CDC and every other medical expert asked, the two highest risk places to be are nursing homes and prisons. In Loretto there are 50 men sharing six toilets and sleeping less than three feet from each other with no ability to

3

social distance. In addition, there are over 300 staff going in and out of the facility every day. It has been widely reported that over 40% of people who have contracted the Corona virus are asymptamatic. There is no possible circumstance where any logical person can state that it is safer for Petitioner to be in Loretto as opposed to his home.

"In few places is the deadly threat of COVID-19 more amplified than in the cramped, overcrowded environment of prisons...Guidance from public health experts, including the Centers for Disease Control and Prevention, instructs that the cornerstone of any effort to contain this infectious disease is the ability to "[s]tay at least 6 feet ( about 2 arms length) from other people," to not "gather in large groups" and to "[s]tay out of crowded places" But at...Federal Correctional Institutions...such fundamental measures are flatly impossible." Mark Wilson, Warden of Elkton Federal Correctional Institution v. Craig Wilson et al S. Ct. 19A1041 (May, 2020).

"Prisoners...Though well aware that social distancing is an indispensable means of protecting themselves,...are powerless to use it." Mark Wilson, Warden of Elkton Federal Correctional Institution v. Craig Wilson et al S. Ct. 19A1041 (May, 2020).

"Congress has provided the Federal Bureau of Prisons with a collection of tools to attempt to ameliorate situations...including recently expanded authority to move

4

prisoners to home confinement." Mark Wilson, Warden of Elkton
Federal Correctional Institution v. Craig Wilson et al S. Ct.
19A1041 (May, 2020).

"The BOP's descriptions of risk-prevention measures...tell only
part of the story. The BOP states that it has "secured all inmates
in their assigned living quarters to decrease virus
transmission"... But because of the layout of...units, that does
not amount to social distancing. At "any given moment" prisoners
are next to someone else." Mark Wilson, Warden of Elkton Federal
Correctional Institution v. Craig Wilson et al S. Ct. 19A1041
(May, 2020).

"...no amount of sanitation would compensate for the inability to
maintain distancing... BOP states that it has "educated inmates
and staff about measures to avoid transmitting COVID-19...no
matter how "educated" they are, staff and inmates cannot possibly
adhere to the social distancing required by the CDC and all health
authorities...("Correctional staff must be in close contact with
prisoners in the course of their regular jobs to enforce security
protocols, escort prisoners across cell blocks and units,
administer medications and supervise meal distribution.") No
amount of education will matter where compliance with recommended
safety measures is "not possible". It is, in short, "impossible to
spread out or social distance...("With continued functioning of
shared spaces for bathing, eating and sleeping, quarantine and
social distancing would be impossible to implement...") Prisoners

live in fear for their lives because "it seems like it's only a matter of time until [they] get this virus." Mark Wilson, Warden of Elkton Federal Correctional Institution v. Craig Wilson et al S. Ct. 19A1041 (May, 2020).

Government position: It is safer for Petitioner to stay in Loretto since there are no known cases as of today.

Petitioner's position: The Judge in Paul Manafort's case (1:17-CR-0021 N. D. VA May 2020) ruled just the opposite using as part of the reason that was releasing Manafort to home confinement the fact that COVID-19 had not arrived in Loretto "but it was only a matter of time" and this was a preventative measure since if Manafort did contract the virus it was likely to kill him. Atheir Amarrah (Case No. 5:17-CR-20464-JEL-EAS-1 Eastern District of Michigan) was released from Loretto as a preventative measure. He has asthma.  Loyd (Loyd v. United States No. 15-20394-1 E.D Mich. May 21, 2020) was released from Loretto as a preventative measure EVEN THOUGH HE HAS NO HEALTH ISSUES.

Government's position: "BOP has placed an additional 2,471 inmates on home confinement". Therefore they are doing their job of getting at risk inmates to home confinement rapidly.

Petitioner's position: It is estimated that 20,000 to 25,000 inmates qualify for release to direct home confinement using the guidelines of Attorney General Barr. 10% of that number have been

released. Courts across the country are acting to try and force the BOP to follow the Attorney General's mandate. For example, a federal judge in Connecticut issued a 74 page order blasting FCI Danbury for not moving quickly enough to release at risk, low risk of recidivism (like Petitioner) to home confinement quickly enough. (Hartford Courant, U.S. Judge backs prison inmates in Danbury on COVID-19 suit, orders warden to move fast on requests for release. May 12).

"The active cases Applicants [BOP] reported as of May 19, confirmed that the COVID risks at Elton remain high. They reported 135 active cases among inmates, and 8 active cases among staff members...The actual numbers are certainly much higher, given the failure to test the vast majority of inmates. On the metric that matters--social distancing--Applicants have made no progress whatsoever. They had identified 837 inmates as being...especially vulnerable to COVID-19...Of those, five prisoners were pending home community confinement placement" and Applicants had deemed six others to "maybe" qualify for such release...All of this means that, to date, despite ongoing community spread of COVID-19 and over 800 vulnerable inmates, Applicants "have not identified any inmates whose confinement has actually been enlarged as a consequence of the preliminary injunction." Mark Wilson, Warden of Elton Federal Correctional Institution v. Craig Wilson et al S. Ct. 19A1041 (May, 2020).

"Similarly, it appeared that having a certain proportion of time

remaining on a sentence was a disqualifier, and so the Court ordered Applicants [BOP] to eliminate that categorical disqualifier as well...None of these disqualifications are statutorily based following enactment of the CARES ACT..which now that it has been "activated" by Attorney General Barr, authorizes home confinement in any case. Rather they were simply imposed by the Government unilaterally. The District Court simply concluded that, when weighed against the risk of COVID-19, these considerations were not sufficient excuses to refuse to transfer an inmate, and so it required the Government to reevaluate the inmates without using these criteria as categorical bars." Mark Wilson, Warden of Elkton Federal Correctional Institution v. Craig Wilson et al S. Ct. 19A1041 (May, 2020).

As of the date of the writing of this motion, Loretto has continued to release to home confinement only those inmates who are a minimum pattern score and have completed at least 50% of their sentence.

Supplemental Citation

The following supplemental citation in support of Petitioner's pending motion. (See exhibit 2) Memorandum, Opinion and Order, United States of America v. Angela Michele Beck, No. 1:13-CR-186-6, June 29, 2019. This case directly establishes the jurisdiction of this Court in matters such as the one before the Court here, and, further establishes the legal arguments set forth by the

Plaintiff. Angela Beck was sentenced pursuant to a guilty plea to 129 months of imprisonment for drug trafficking and 60 months consecutive for a 924(c) violation. The total sentence was 189 months. The Court later reduced the sentence to a total of 165 months based on a change in the law. Ms. Beck sought a compassionate release after serving only 76 months which the Government vehemently opposed. As shown, the Court granted the compassionate release after considering 3553(a) factors and reduced the sentence to time served, the Court obviously having jurisdiction to hear such matters to reduce sentences under 3582(c)(1)(A) and this case is pre-COVID-19. Also of relevance here, is the Petitioner sets forth a Constitutional claim under the 14th amendment. Beck's claim was an 8th Amendment issue. For these reasons and those set forth in the Petitioner's pleadings this case is believed to be substantially relevant.

The issues addressed by the Court include the following:

1) Jurisdiction. The Court clearly has jurisdiction to hear 3582(c)(1)(A) motions as well as the authority to reduce sentences as established in Beck and numerous other cases stated in Plaintiff's original motion and supplement.

2) Extraordinary and Compelling reasons per the sentencing guidelines at section 1B1.13 consistent with the sentencing commission. This is clearly addressed by the Court.

9

3) 3553(a) factors. The Court has addressed this and the issues in Beck in terms of conduct are far worse than those now before the Court.

Due to the serious and time sensitive nature of this situation and due to the fact that the Petitioner is not an attorney. The Petitioner humbly requests that the Court appoint him an attorney to represent him in this matter.

Respectfully Submitted;

P.O. Box 1000

Cresson PA 16630

MCWHERTER, Jimmy
Reg. No. 51518-039

This is in response to your Request for Compassionate
Release/Reduction in Sentence Consideration dated May 15, 2020.
You request a Compassionate Release/Reduction in Sentence based on
"you do not want to contract Corona Virus in prison".

Title 18 of the United States Code, section 3582(c)(1)(A), allows a
sentencing court, on motion of the Director of the BOP, to reduce a
term of imprisonment for extraordinary or compelling reasons.  BOP
Program Statement 5050.50, Compassionate Release/Reduction in
Sentence:  Procedures for Implementation of 18 U.S.C. §
3582(c)(1)(A) and 4205(g), provided guidance on the types of
circumstances that present extraordinary or compelling reasons,
such as an inmate's terminal medical condition; debilitated medical
condition; status as a "new law" elderly inmate, and elderly inmate
with medical conditions, or an "other elderly inmate"; the death or
incapacitation of the family member caregiver of the inmate's minor
child; or the incapacitation of the inmate's spouse or registered
partner.  Your request has been evaluated consistent with this
general guidance.

The BOP is taking extraordinary measures to contain the spread
of COVID-19 and treat any affected inmates.  We recognize that
you, like all of us, have legitimate concerns and fears about
the spread and effects of the virus.  However, your concern
about being potentially exposed to, or possibly contracting
COVID-19 does not currently warrant an early release from your
sentence.

Accordingly, your request for Compassionate Release/Reduction in
Sentence is denied.  If you are dissatisfied with this response,
the First Step Act allows you to file an appeal directly to the
court 30 days after requesting compassionate release from the
Warden without utilizing and/or exhausting the Administrative
Remedy process.  You may also appeal through the Administrative
Remedy Program.

_____          June 1, 2020
V. Moser, Warden                      Date

---

**UNITED STATES OF AMERICA, Plaintiff, v. ANGELA MICHELLE BECK, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**2019 U.S. Dist. LEXIS 108542**
**1:13-CR-186-6**
**June 28, 2019, Decided**
**June 28, 2019, Filed**

---

**Editorial Information: Prior History**

United States v. Beck, 589 Fed. Appx. 147, 2015 U.S. App. LEXIS 127 (4th Cir. N.C., Jan. 6, 2015)

**Counsel**             {2019 U.S. Dist. LEXIS 1}For JOSEPH PATRICK COCKERHAM, Defendant: J. CLARK FISCHER, LEAD ATTORNEY, J. CLARK FISCHER, WINSTON-SALEM, NC.

For JIMMY DAVID HUNTER, Defendant: ROBERT A. BROADIE, LEAD ATTORNEY, CAROLINA LEGAL SOLUTIONS, HIGH POINT, NC.

For USA, Plaintiff: ANGELA HEWLETT MILLER, LEAD ATTORNEY, OFFICE OF U. S. ATTORNEY, GREENSBORO, NC; GRAHAM TOD GREEN, LEAD ATTORNEY, U. S. ATTORNEY'S OFFICE, WINSTON-SALEM, NC; ROBERT M. HAMILTON, LEAD ATTORNEY, U. S. ATTORNEY'S OFFICE, GREENSBORO, NC; MEREDITH C. RUGGLES, UNITED STATES ATTORNEY'S OFFICE, GREENSBORO, NC; MICHAEL F. JOSEPH, OFFICE OF U. S. ATTORNEY, Greensboro, NC.

**Judges:** Catherine C. Eagles, UNITED STATES DISTRICT JUDGE.

**Opinion**

**Opinion by:**             Catherine C. Eagles

**Opinion**

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

Angela M. **Beck** is a federal prisoner serving a sentence for drug and firearms offenses. She has cancer in her left breast and the Bureau of Prisons has not provided appropriate medical care for her disease, with repeated delays that have prevented her from timely obtaining urgent tests and treatment. In the meantime, her cancer spread to her lymph nodes and possibly to her right breast. Ms. **Beck** has filed a motion under the First Step Act of 2018 seeking immediate{2019 U.S. Dist. LEXIS 2} compassionate release. Because Ms. Beck's invasive cancer and BoP's history of indifference to her treatment constitute extraordinary and compelling reasons, and because the § 3553(a) factors support a sentence reduction to time served, the motion for compassionate release will be granted.

**I. Facts and Procedural History**

The Court has considered the record evidence in this criminal case, where Ms. **Beck** submitted her motion for compassionate release. The Court has also considered the documentary evidence

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

submitted in Ms. Beck's civil case against BoP officials for inadequate medical care in violation of her constitutional rights. *See* **Beck** v. *Hurwitz*, No. 1:19-cv-00488 (M.D.N.C. May 10, 2019). Unless otherwise specified, docket citations are to the criminal case.1

Beginning sometime in 2012, Angela **Beck** and her husband began operating a methamphetamine lab in their home in Surry County, North Carolina. *See* Doc. 192 at 12-13. They participated in a conspiracy to distribute methamphetamine that included many other participants, *see* Doc. 73 (identifying 20 defendants), and other labs. *See* Doc. 192 at 1-20. During a search of the **Beck** home on January 4, 2013, law enforcement located items consistent{**2019 U.S. Dist. LEXIS 3}** with the manufacture of methamphetamine, 12 firearms, and drug paraphernalia. *Id.* at 12-13. Several persons on the premises possessed methamphetamine, including Ms. **Beck**. *Id.* at 13. In the preceding months, Ms. **Beck** had purchased over 42 grams of pseudoephedrine, one of the precursor chemicals that can be used to manufacture methamphetamine. *Id.* at 14.

After Ms. **Beck** was arrested on state charges and released on bond, *see* Doc. 429-1 at 1, she and her husband continued to manufacture and sell meth out of their home. Doc. 192 at 16. During a search on February 18, 2013, law enforcement located items consistent with the manufacture of methamphetamine, a revolver and ammunition, drug paraphernalia, and numerous cell phones. *Id.*

Several months after her second arrest, Ms. **Beck** pleaded guilty in this Court to conspiracy to distribute 500 grams or more of methamphetamine (Count 1, object 1) and possession of a firearm in furtherance of a drug trafficking crime (Count 12). Doc. 201 at ¶¶ 1-2; Minute Entry 09/06/2013. The Court granted the Government's motion under U.S.S.G. § 5K1.1 to depart from the guidelines, Doc. 249; Minute Entry 12/12/2013, and sentenced her to 129 months of imprisonment as to Count 1 and, as required by law, to a{**2019 U.S. Dist. LEXIS 4}** consecutive term of 60 months as to Count 12, for a total sentence of 189 months. Doc. 277 at 2. The Fourth Circuit dismissed her appeal. Doc. 363. The Court later reduced her sentence on Count 1 to 105 months based on a retroactive sentencing guideline amendment, making her total sentence 165 months. Doc. 442.

Ms. **Beck** is in the custody of the **United** States Bureau of Prisons and is assigned to the Federal Correctional Institution in Aliceville, Alabama. Civil Doc. 3-3 at ¶ 1; Civil Doc. 12 at ¶ 3. She has served approximately 76 months of her 165-month sentence. *See* Doc. 429-1 at 1. There is nothing in the record to indicate that she has incurred any disciplinary violations or infractions while in BoP's custody.

Ms. **Beck** is 47-years old, Doc. 429-1 at 3, and has a family history of breast cancer. Civil Doc. 3-3 at ¶ 3. In the fall of 2017, she discovered lumps in her left breast and promptly sought medical attention. *Id.* at ¶¶ 2, 4-5. When she first saw the prison doctor to report the masses, *see id.* at ¶ 6, he recommended imaging and consultation with a surgeon, 10/16/2017--Griffin [BoP 22], but almost two months passed before BoP took Ms. **Beck** to see a surgeon. Civil Doc. 3-1 at ¶ 19.{**2019 U.S. Dist. LEXIS 5}**2 Imaging results obtained two weeks later were "highly suggestive" of cancer, *id.* at ¶ 19; 12/22/2017--DeVenny [BoP 36], and in the ensuing days, weeks, and months, Ms. Beck's doctors repeatedly said she needed a biopsy to test for cancer. *See, e.g.,* 12/22/2017--DeVenny [BoP 36]; 12/29/2017--Griffin [BoP 39]; 01/08/2018--Griffin [BoP 65]; 05/11/2018--Griffin [BoP 96]; 08/07/2018--Bilton [BoP 110]. A biopsy should be performed no more than two months after the detection of an abnormality, Civil Doc. 3-1 at ¶ 11, but BoP waited eight months after imaging before taking her for a biopsy. *Id.* at ¶ 20.

When the biopsy was finally performed, the surgeon observed "extensive breast disease that extended laterally." 08/28/2018--Bilton [BoP 115]. The biopsy confirmed invasive cancer in her left breast and the surgeon recommended additional surgery, but another two months passed before BoP took her for surgery. Civil Doc. 3-1 at ¶¶ 20-21. In November 2018, over a year after Ms. **Beck** first

lydcases                                                    2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

noticed the lumps, the surgeon removed her entire left breast and part of her pectoral muscle and confirmed a diagnosis of metastatic breast cancer. 11/01/2018--Bilton [BoP 252]; 11/02/2018--Bilton [Page 18, Doc.{2019 U.S. Dist. LEXIS 6} #10] ("Post op diagnosis: Left breast cancer."); *see also* Civil Doc. 3-1 at ¶ 21 (declaration of Dr. Winkfield, reviewing records and noting a "diagnosis of stage IIB (T2N1) breast cancer"). During surgery, doctors discovered the cancer had spread to Ms. Beck's lymph nodes, 11/06/18--Bilton [Page 34, Doc. #12] (noting "metastatic carcinoma" in two nodes), and removed several nodes. Civil Doc. 3-1 at ¶ 21.

Despite the fact that she had a drain and despite her surgeon's direction that she needed to see him about a week or less after surgery, 11/03/2018--Bilton [Page 10, Doc. #6], BoP did not return her for a post-operative visit until six weeks had passed. Civil Doc. 3-1 at ¶ 22. When she finally saw the surgeon again, he told her that she needed an oncology appointment for potential chemotherapy, *id.*, but five months elapsed after her surgery and over three months passed after her surgeon advised her to see an oncologist before BoP took Ms. **Beck** to a medical oncologist to determine appropriate treatment and therapy. *Id.* at ¶¶ 22-23.

In total, some seventeen months passed between the time medical care providers at the prison learned about the lumps in Ms. Beck's left breast, *see id.* at{2019 U.S. Dist. LEXIS 7} ¶ 18; Civil Doc. 3-3 at ¶¶ 5-6, and the time BoP allowed her to consult with a medical oncologist. Civil Doc. 3-1 at ¶ 23; *see also id.* at ¶ 15 (noting chemotherapy is sometimes implemented before surgery to help shrink "invasive" and "extensive" tumors). When BoP finally took her to see a medical oncologist on April 3, 2019, the oncologist determined that it was too late to begin chemotherapy, which must be instituted soon after surgery to be effective. *See* 04/03/2019--Evans [BoP 311]; *see also* Civil Doc. 3-1 at ¶ 23. When BoP took her to a radiation oncologist in May 2019, he similarly determined that it was too late to begin radiation therapy. 05/03/2019--Crew [BoP 318].

Dr. Karen Winkfield, an experienced oncologist at Wake Forest Baptist Comprehensive Cancer Center who reviewed Ms. Beck's medical records, has testified that "with respect to timing of systemic therapy following definitive surgery, delays beyond 12 weeks (3 months) compromise both recurrence free survival and overall survival." Civil Doc. 3-1 at ¶ 26. BoP waited well over three months before taking Ms. **Beck** to see physicians who could order such treatment. *Id.* at ¶ 23.

In January 2019, Ms. **Beck** reported new lumps{2019 U.S. Dist. LEXIS 8} in her right breast to prison medical officials, who confirmed the lumps. Civil Doc. 3-3 at ¶ 15; 01/30/2019--Nikki [BoP 259] (noting "firm nodule approximately golf ball size[d]" in her right breast); 02/12/2019--Hunter-Buskey [BoP 276] (noting "multiple lumps [in her] right breast; . . . the first is walnut size[d] and the second is a small peach size"). Nearly six weeks later, BoP took Ms. **Beck** for a PET scan, which suggested the new lumps may be benign. 03/11/2019--Guarisco [BoP 287]. About two weeks after that, BoP took her to see a surgeon, who noted a "solid mass" and cyst in her right breast, observed that the new masses "appear benign," and ordered a puncture aspiration and ultrasound guidance. 03/27/2019--Bilton [USA Bilton 3-4]. BoP did not schedule a further consultation with the surgeon until mid-June, nearly three months after the initial surgical evaluation.3 Civil Doc. 29 at ¶ 8; Civil Doc. 44 at ¶ 9. It appears Ms. **Beck** has received the tests and procedures the surgeon ordered in March, Civil Doc. 45 at 4; Civil Doc. 44 at ¶ 9, but there are still "multiple nodularities" in her right breast and the surgeon has ordered another ultrasound, noting the potential need for{2019 U.S. Dist. LEXIS 9} a biopsy. Civil Doc. 45 at 5. Pursuant to a court order to schedule recommended treatments, *see infra,* BoP has scheduled the ultrasound and other appointments. Civil Doc. 47 at ¶¶ 1-4.

As noted *supra*, Dr. Winkfield, an experienced oncologist, reviewed Ms. Beck's medical records. While she was unable to determine from BoP's records "whether the above delays in care . . . have

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

resulted in progression of [Ms. Beck's] cancer," Civil Doc. 3-1 at ¶ 27, Dr. Winkfield testified without dispute that "[p]rompt evaluation is particularly important in patients who have a family history of breast cancer" and that the "delays in time to surgery and subsequent delays in adjuvant therapy clearly raise a significant risk of relapse and irreparable harm to Ms. **Beck**." *Id.* at ¶¶ 11, 27.

In early December 2018, Ms. **Beck** through counsel asked the Warden of FCI Aliceville to file a compassionate release motion to reduce her sentence based on her medical condition and the poor medical care she was receiving. Doc. 522-1 at 6. On December 17, the Warden acknowledged receipt of the request and explained BoP's general criteria for evaluating such requests. *Id.* at 5. After over a month of no action on the request,{2019 U.S. Dist. LEXIS 10} Ms. **Beck** submitted a second request to BoP to file a compassionate release motion on her behalf. Doc. 521-1 at ¶ 3. A week later, with no BoP action on either request, Ms. **Beck** filed her motion for compassionate release with this Court on January 24, 2019. Doc. 494.

Nearly two months later, on the day the Government's response was due, *see* Text Order 02/27/19, the Government sought a stay so that BoP could finish its administrative review of Ms. Beck's request. Doc. 510. Ms. **Beck** did not object, *id*, and the Court granted the stay. Doc. 511. Another six weeks passed with no action by BoP on the request, and on May 10, 2019, Ms. **Beck** initiated a civil suit against several BoP officials and a private contractor, alleging violations of her Eighth Amendment rights against cruel and unusual punishment. Civil Doc. 1. She sought a temporary restraining order and preliminary injunction. Civil Doc. 3. BoP denied her request for a compassionate release motion almost immediately thereafter. Doc. 521-1 at 8. The same day, the Court lifted the stay and directed the Government to file a response to her compassionate release motion. *See* Text Order 05/13/2019; Doc. 521 (Government's response in opposition).

The Court{2019 U.S. Dist. LEXIS 11} held a hearing on Ms. Beck's motion for a TRO in her civil case on May 17, 2019. Civil Minute Entry 05/17/2019. On May 20, the Court entered a TRO compelling three BoP officials in their official capacities to take specific steps to provide urgent medical treatment to Ms. **Beck** for her cancer. Civil Doc. 15; *see also* Civil Doc. 16 (Amended TRO). The Court found that Ms. **Beck** had shown a likelihood of success on the merits of her claim that BoP officials' indifference to her life-threatening medical condition and treatment violated her Eighth Amendment rights. Civil Doc. 16. After another hearing, *see* Minute Entry 06/05/2019, the Court extended the Amended TRO while considering this motion and a motion for preliminary injunction. Civil Doc. 40.

The Court will address additional facts as needed in the context of the issues presented.

## II. Compassionate Release

Federal law has long authorized courts to reduce the sentences of federal prisoners facing extraordinary health conditions and other serious hardships, but only under very limited circumstances. Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the BoP Director.{2019 U.S. Dist. LEXIS 12}4 *See* Pub. L. No. 98-473, ch. II(D) § 3582(c)(1)(A), 98 Stat. 1837 (1984); *see also Green v. Apker*, No. 5:13-HC-2159-FL, 2014 U.S. Dist. LEXIS 94376, 2014 WL 3487247, at *2 (E.D.N.C. July 11, 2014) (collecting cases and noting that "BOP's decision regarding whether or not to file a motion for compassionate release is judicially unreviewable"). Then as now, a defendant must satisfy one of two statutory conditions before a court can grant a BoP compassionate release motion: (*i*) the defendant has to be at least 70 years old, have served at least 30 years in prison, and the BoP Director must have determined the defendant was not a danger to the public; or (*ii*) "extraordinary and compelling reasons" warrant the reduction. 18 U.S.C. § 3582(c)(1)(A). When BoP files such motions, reviewing courts also must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)

1ydcases                                                        4

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

and can only grant reductions to defendants who met the statutory requirements if the reduction was "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1).

To assist courts, the Sentencing Commission adopted U.S.S.G. § 1B1.13 as the applicable policy statement for motions filed by the BoP Director under § 3582(c)(1)(A). The guideline essentially repeats the statutory prerequisites and adds only a requirement that{2019 U.S. Dist. LEXIS 13} the defendant must not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

The application notes to § 1B1.13 are more specific. The notes list three specific categories and examples of "extraordinary and compelling reasons," along with a fourth catch-all provision.

Specifically, the notes discuss when a defendant's medical condition (subdivision A), health and age together (subdivision B), or family circumstances (subdivision C) will qualify. U.S.S.G. § 1B1.13, application note 1. Subdivision A provides that a "medical condition of the defendant" may qualify as an "extraordinary and compelling reason" justifying a sentence reduction in several different circumstances, such as when, *inter alia*, the defendant has a "terminal illness." *Id.* at note 1(A)(i). Subdivision D acknowledges that there may be other situations which constitute extraordinary and compelling reasons and provides a non-specific blanket authorization for early release, labeled "Other Reasons." *Id.* at note 1(D). That provision allows compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described{2019 U.S. Dist. LEXIS 14} in subdivisions (A) through (C)." *Id.*

In 2018, Congress passed the First Step Act. Pub. L. 115-391, 132 Stat. 5194. Among other things, it amended § 3582(c)(1)(A) to add a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BoP Director so long as the defendant has asked the Director to bring such a motion and the Director fails or refuses.5 The First Step Act applies the same statutory requirements to a defendant's motion for compassionate release as previously applied, and still apply, to motions by the Director: "extraordinary and compelling reasons" must warrant the reduction,6 the court must consider the § 3553(a) factors, and the reduction must be "consistent" with any "applicable" policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A)(i).

There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. By its terms, the old policy statement applies to motions for compassionate release filed by the BoP Director and makes no mention of motions filed by defendants. U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons . . . the court may reduce a term of imprisonment . . . ."); *id.* at application note 4 ("A reduction under this policy statement{2019 U.S. Dist. LEXIS 15} may be granted only upon motion by the Director of the Bureau of Prisons."). The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, *see, e.g.*, **United** States v. Gross, No. 2:04-CR-32-RMP, 2019 U.S. Dist. LEXIS 97933, 2019 WL 2437463, at *2 (E.D. Wash. June 11, 2019), nor has it adopted a new policy statement applicable to motions filed by defendants.7

While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i). An interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role. *See* **United** States v. Cantu, No. 1:05-CR-458-1, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("Because the Commission's statutory authority is limited to explaining the

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

appropriate use of sentence-modification provisions under the *current* statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority . . . ." (emphasis in original)). It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which **{2019 U.S. Dist. LEXIS 16}** explicitly allows courts to grant such motions even when BoP finds they are not appropriate. Pub. L. 115-391, Title VI § 603(b), 132 Stat. 5194 (Dec. 21, 2018) (captioned "Increasing the use and transparency of compassionate release"); *see also Cantu*, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *4 ("[T]he policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582 (emphasis in original)).8 Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.

### III. Findings and Analysis

Ms. Beck's motion for a sentence reduction is properly before the Court. She first requested compassionate release through a letter from her lawyer to Warden Patricia V. Bradley, whose office received the letter on December 10, 2018. Doc. 522-1 at 6. The Warden acknowledged receipt of her request on December 17, *id.* at 5, but did not act on her request **{2019 U.S. Dist. LEXIS 17}** until issuing a denial letter in May 2019. Doc. 521-1 at ¶ 4, p. 8. Ms. **Beck** filed her motion in this Court on January 24, 2019, Doc. 494, after "the lapse of 30 days from the receipt of [her] request by the warden." 18 U.S.C. § 3582(c)(1)(A).

As discussed *supra*, compassionate release motions require consideration of any relevant § 3553(a) factors and whether there are "extraordinary and compelling reasons" that warrant a sentence reduction. Any reduction must also be consistent with "applicable" policy statements issued by the Sentencing Commission.

Although there is no policy statement applicable to a defendant's motion for compassionate release, the old policy statement does provide some assistance. Unsurprisingly, it overlaps to some extent with statutory considerations such as the § 3553(a) factors. For example, the old policy statement requires courts to consider the defendant's dangerousness, U.S.S.G. § 1B1.13(2), and that is also a part of the § 3553(a) requirement that courts consider the need to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(C). Similarly, the old policy statement says that a defendant's medical condition can be an appropriate reason for a sentence reduction, U.S.S.G. § 1B1.13, application note 1(A), (B), and one of the § 3553(a) factors is a defendant's need for medical **{2019 U.S. Dist. LEXIS 18}** treatment. *See* 18 U.S.C. § 3553(a)(2)(D).

The Court first considers whether extraordinary and compelling reasons exist under § 3582(c)(1)(A)(i). Because it still provides helpful guidance, the Court then evaluates the motion in light of the old policy statement and its application notes, as well as other indicators of Sentencing Commission policy. Finally, the Court will evaluate a sentence reduction under the § 3553(a) factors.

### a. Extraordinary and Compelling Reasons under 18 U.S.C § 3582(c)(1)(A)(i)

Ms. **Beck** has invasive breast cancer and has received grossly inadequate treatment for her condition while serving her sentence in BoP custody. During the lengthy delays, her cancer spread to her lymph nodes. Absent judicial oversight, she is unlikely to receive better treatment at FCI Aliceville going forward. She is in urgent need of appropriate treatment to prevent the further spread

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

of her disease and the potential loss of her life. These are "extraordinary and compelling reasons" to reduce her sentence under § 3582(c)(1)(A)(i).

After Ms. **Beck** reported lumps in her left breast to prison officials and imaging suggested it was cancer, BoP waited eight months to take her for a biopsy. Civil Doc. 3-1 at ¶ 20. The biopsy confirmed invasive cancer in her left breast, *id.*, and two months**{2019 U.S. Dist. LEXIS 19}** later, when BoP finally took her to surgery, the disease had metastasized to her lymph nodes and required a radical mastectomy. 11/01/2018--Bilton [BoP 252]; 11/06/2018--Bilton [Page 34, Doc. #12]; Civil Doc. 3-1 at ¶ 21. After surgery, BoP disregarded her surgeon's order of a follow-up visit after one week and did not return her to the surgeon for six weeks. 11/03/2018--Bilton [Page 10, Doc. #6]; Civil Doc. 3-1 at ¶ 22. BoP delayed scheduling an oncology appointment for five months, and as a result, she was unable to obtain the benefits of chemo or radiation therapy. 04/03/2019--Evans [BoP 311]; 05/03/2019--Crew [BoP 318]. Ms. **Beck** has new lumps in her right breast, *see, e.g.*, Civil Doc. 3-3 at ¶ 15, and BoP continues to countenance delays in treatment by blaming logistical issues, *see supra* note 3, and it has provided erroneous information about her recent appointments to the Court. *See* Civil Doc. 18-1 at ¶¶ 1-2; Civil Doc. 23 at 2. Although BoP has timely scheduled certain appointments of late, *see* Civil Docs. 29, 47, that was pursuant to a temporary injunction directing BoP officials to ensure that appointments recommended by treating physicians were scheduled as quickly as possible.**{2019 U.S. Dist. LEXIS 20}** Civil Docs. 16, 40 at ¶ 3. As its name indicates, this order was temporary.

As these facts establish, the quality of treatment BoP has provided Ms. **Beck** for her cancer has been abysmal. *See, e.g.*, Civil Doc. 16 at pp. 3-6, ¶¶ 2-8; Civil Doc. 3-1 at ¶ 24 ("[T]he . . . course of action by the prison system in responding to Ms. Beck's known breast cancer, punctuated by repeated delays in care, was grossly inadequate . . . [and] there is no medical justification"). BoP has not acknowledged deficiencies in Ms. Beck's medical care, *see, e.g.*, Civil Doc. 12 at ¶ 9 (declaration of a BOP physician's assistant, stating that "the Bureau is currently providing inmate **Beck** with appropriate medical care for her breast cancer"), which indicates BoP is unlikely to meet its constitutional obligations in the future.[9] As long as she stays in BoP custody, she faces a substantial likelihood of substandard medical care for her life-threatening disease.

Dr. Winkfield's testimony, which BoP has not disputed, establishes that the delays in treatment have increased the risk that Ms. Beck's cancer has spread or will recur and has compromised her prospects for survival. Civil Doc. 3-1 at ¶¶ 24, 26-27. Though**{2019 U.S. Dist. LEXIS 21}** the statute "does not define--or place any limits on--what 'extraordinary and compelling reasons' might warrant" a sentence reduction, *Cantu*, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *5 (citations and quotations omitted), one certainly hopes that BoP's gross mismanagement of medical care for an inmate's deadly disease is extraordinary. *See* Black's Law Dictionary, *Extraordinary* (11th ed. 2019) ("Beyond what is usual, customary, regular, or common."). Breast cancer can kill without appropriate medical care, and Ms. Beck's need to obtain adequate treatment for her disease when BoP appears unable to provide it without court oversight is a compelling reason for a sentence reduction. Black's Law Dictionary, *Compelling Need* (11th ed. 2019) ("A need so great that irreparable harm or injustice would result if it is not met.").

Ms. **Beck** has shown that extraordinary and compelling reasons warrant a reduction in her sentence under § 3582(c)(1)(A)(i). *See Cantu*, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *3-6 (on motion by a defendant, construing § 3582 to determine whether extraordinary or compelling reasons existed on a basis other than those listed in the old policy statement).

**b. The Reduction is Consistent with the Sentencing Commission's Guidance**

In evaluating compassionate release motions filed by defendants, the old**{2019 U.S. Dist. LEXIS 22}**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

policy statement does not bind the Court's interpretation of § 3582(c)(1)(A)(i), *see* discussion *supra*, but it does provide useful guidance. Read as a whole, the application notes suggest a flexible approach which considers all relevant circumstances. They indicate that medical conditions, alone or in conjunction with other factors, can constitute extraordinary and compelling reasons, and they recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances. U.S.S.G. § 1B1.13, application note 1(A)-(B), (D).

Subdivision A takes a non-exclusive approach to terminal illness, providing a few examples and noting that "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, application note 1(A)(i); *see also* U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 1-2, Apr. 28, 2016 (noting that one purpose of 2016 Amendments to the application note was to broaden the "terminal illness" category because of difficulties in estimating prognosis and to provide a "non-exhaustive list of . . . terminal illness[es]" for "added clarity"). It specifically lists "metastatic solid-tumor cancer" as an example of a terminal illness warranting a sentence reduction, U.S.S.G. § 1B1.13, application note 1(A)(i), and that is what Ms. **Beck** has.10

It is undisputed that breast cancer can be a terminal disease and that Ms. Beck's family history of breast cancer, the delay-induced lack of chemotherapy and radiation therapy, and the delays in other procedures, including biopsies and surgeries, place her at an abnormally high risk of recurrence. Civil Doc. 3-1 at ¶¶ 24-27 (noting she stands at a "significant risk of relapse and irreparable harm"). It is also undisputed that the trajectory her cancer will take is heavily dependent on the quality of treatment she receives going forward. *See, e.g., id.* at ¶¶ 16-17, 25-26 ("Studies have shown that with respect to timing of systemic therapy following definitive surgery, delays beyond 12 weeks (3 months) compromise both recurrence free survival and overall survival."). Even BoP's doctor characterizes her prognosis as "undetermined." Doc. 521-1 at 5. While a standard case of properly-treated breast cancer may not qualify as a "terminal illness" under Subdivision A, Ms. **Beck** has not received proper treatment, and it is questionable that BoP will provide appropriate medical care for this life-threatening disease going forward, at least not without court oversight. *See infra* Section III(d).{**2019 U.S. Dist. LEXIS 24**} A sentence reduction is consistent with Subdivision A.

Before the First Step Act, the Sentencing Commission recognized that the specific examples provided in Subdivisions A through C were likely to exclude cases where compassionate release was nonetheless appropriate. Thus, it gave the BoP Director--the only party at the time who could make such a motion--discretion to move for a sentence reduction if there existed "in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, application note 1(D). Though Subdivision D is reserved to the BoP Director, the Commission nonetheless affirmed, even before the First Step Act, that courts are in a "unique" position to determine whether such circumstances are present.11 Read in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BoP Director in evaluating motions by defendants for compassionate release. *See* discussion *supra*; *cf. Cantu*, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *5 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended{**2019 U.S. Dist. LEXIS 25**} provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

As previously discussed, breast cancer is a life-threatening illness even after tumors are removed, and particularly so with a family history of breast cancer, delayed biopsies and surgeries, and a lack of chemotherapy or radiation therapy. *See, e.g.*, Civil Doc. 3-1 at ¶¶ 25-26. BoP's indifference to Ms.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Beck's cancer treatment has likely reached the level of a constitutional violation, *see* Civil Doc. 16, creating a significant risk that her cancer will spread, if it has not already, and compromising her chance of survival. Civil Doc. 3-1 at ¶¶ 24-27. Her continued detention in BoP custody poses an unacceptable risk to her health and life and constitutes an extraordinary and compelling circumstance under Subdivision D of the application note. *Cf. Setser v. United States*, 566 U.S. 231, 242-43, 132 S. Ct. 1463, 182 L. Ed. 2d 455 (2012) (noting that the pre-First Step Act compassionate release provision in § 3582(c)(1)(A) also provides a mechanism for a district court to grant relief when its "failure to anticipate developments that take place after . . . sentencing . . . produce unfairness to the defendant." (internal citations and{2019 U.S. Dist. LEXIS 26} quotations omitted)). A sentence reduction is consistent with the substance of Subdivision D.

The old policy statement also requires that the defendant not pose a "danger to the safety of any other person or to the community" under 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). This inquiry heavily depends on the nature and circumstances of the offense and the history and characteristics of the defendant, § 3142(g)(1), (3), both of which are core considerations in the § 3553(a) analysis. As such, the Court will consider dangerousness together with the other applicable § 3553(a) factors in the next section.

**c. The § 3553(a) Factors and Dangerousness**

Considering the nature and circumstances of the offense, Ms. Beck's criminal conduct in 2012 was undoubtedly serious. She and her husband manufactured and distributed large amounts of methamphetamine from their home and possessed firearms in furtherance of that offense. *See* Doc. 192. After she was arrested on state charges and released on bond, she continued to engage in the methamphetamine business out of her home. *See id.* at 16. Her seventeen-year-old daughter lived in the home and her parents allowed her to participate in producing methamphetamine. Doc. 429-1 at ¶¶ 52-53, 58. As this case sadly shows, methamphetamine is a dangerous,{2019 U.S. Dist. LEXIS 27} addictive drug that destroys individuals and families, and the need to deter and punish persons who place these drugs into the community is recognized by the significant sentences suggested by the guidelines when methamphetamine is involved. *See generally* U.S.S.G. § 2D1.1.

As to her history and characteristics, Ms. **Beck** had a minor criminal history consisting only of misdemeanors before committing the 2012 crimes. *See* Doc. 429-1 at ¶¶ 80-87. Most were worthless check convictions, *id.* at ¶¶ 81-84, and except for a probationary sentence in 2009 for contributing to the delinquency of a minor, *id.* at ¶ 86, the punishment was limited to restitution and court costs. For the 2009 sentence, she received 12 months of probation, *id.* at ¶ 86, which it appears she successfully completed. In her 42 years, she had never been to prison before the arrests leading to the convictions in this case and she had no previous involvement in the drug trade. None of her prior criminal conduct was violent. While she and her husband kept firearms in their home in connection with their drug business, an undoubtedly dangerous crime, there was no evidence or indication that she ever used or pointed a gun at anyone or that she threatened{2019 U.S. Dist. LEXIS 28} anyone with a firearm.

Ms. **Beck** had a long history of legitimate employment, working steadily in the family business of servicing septic tanks for twenty years. *Id.* ¶ 103. She has longstanding ties to Ararat, North Carolina, where she plans to reside upon release, Doc. 494 at 3 ¶ 1, and she lived in her home there for over twenty-five years before she committed the crimes that led to her incarceration. Doc. 429-1 at ¶ 97.

As a teenager, Ms. **Beck** was molested by her grandfather, Doc. 429-1 at ¶ 99, and shortly before she committed the drug and firearms crimes in 2012, her daughter was molested by a family friend. *Id.* at ¶ 100. Soon after, Ms. **Beck** began using methamphetamine and became addicted. *See id.* at ¶¶ 100-01. While Ms. **Beck** was substantially involved in the criminal conspiracy and was not a

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

minor participant, the record shows that her husband played a larger role in distributing the methamphetamine. *See* Doc. 192.

After her second arrest related to methamphetamine, Ms. **Beck** took steps to mitigate the harm caused by her criminal conduct. Even before her federal indictment, she cooperated with law enforcement, *see* Doc. 249 at ¶¶ 1-2, and upon indictment she quickly pled guilty. Doc.{**2019 U.S. Dist. LEXIS 29}** 429-1 at ¶¶ 76-77. She continued her cooperation after being indicted and rendered substantial assistance to authorities. Doc. 249 at ¶ 3; Minute Entry 12/12/2013.

Ms. Beck's invasive breast cancer, her recent radical mastectomy, the new masses in her right breast, her dependence on cancer treatment and therapy, her age (47), the absence of any indication of violence in her past, and her work history make recidivism unlikely.12 Sentencing Commission studies suggest that retroactive sentence reductions do not increase recidivism rates13 and that recidivism is extremely rare among inmates who qualify for BoP's compassionate release program.14 While the BoP Director did not make a compassionate release motion for Ms. **Beck**, someone with her health issues is more comparable to those offenders than to the general population of federal prisoners.

Though recidivism is always a risk, there are conditions the Court can impose to "reasonably assure . . . the safety of any other person{**2019 U.S. Dist. LEXIS 30}** and the community," 18 U.S.C. § 3142(g), despite the serious nature of her crimes. She will be on supervised release for five years, and the standard and special conditions previously imposed will result in substantial oversight by the Probation Office. *See* Doc. 277 at 3-4 (noting, among other conditions, that she is subject to warrantless searches on reasonable terms and may not leave the district without permission from the Court or her probation officer). As a precaution, the Court will add two additional requirements: one, Ms. **Beck** may only live at a place and with persons approved in advance by the probation officer to ensure that she is not living with persons who may still be involved with illegal drugs, and two, she may not associate with any co-defendant, excepting her husband, or any person on pretrial release or post release supervision. With appropriate supervision, the Court concludes that Ms. **Beck** "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

The 3553(a) factors, taken as a whole, favor release. Though her offense was serious, Ms. **Beck** has been in custody for over six years; that is a significant punishment, especially for someone who had never{**2019 U.S. Dist. LEXIS 31}** been incarcerated before. *Cf., e.g.,* **United** *States v. Lenagh,* No. 8:07CR346, 2009 U.S. Dist. LEXIS 9226, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009) ("A sentence of 24 months is a significant sentence, especially to an offender who has never been incarcerated at all."). It is longer than the five-year mandatory minimum sentence required by Congress for her firearms offense. Given Ms. Beck's minor criminal record before she committed these crimes, that the crimes were precipitated by a traumatic life event and connected to her addiction, and that she timely accepted responsibility and assisted the authorities, her six-plus years of imprisonment and additional supervised release are sufficient to punish her for her crimes and deter her from committing future offenses. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). She has served nearly two years of her term with invasive breast cancer, and BoP has repeatedly mismanaged her care, including delaying medical appointments for so long that neither chemo nor radiation therapy would be effective. *See supra* Section I. "This means that [her] sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in [her] condition would be greater than necessary to serve the purposes of punishment set forth{**2019 U.S. Dist. LEXIS 32}** in § 3553(a)(2)," **United** *States v. McGraw,* No. 2:02-cr-00018-LJM-CMM, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019), and supports a reduction in her sentence "to provide the defendant with needed . . . medical care . . . in the most effective manner."

1ydcases                                    10

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

18 U.S.C. § 3553(a)(2)(D). And, for the reasons noted *supra*, further incarceration is not needed to protect the public. 18 U.S.C. § 3553(a)(2)(C).

A reduction in Ms. Beck's sentence to time served--approximately 76 months--is sufficient to serve the purposes of punishment under § 3553(a)(2). And, given her breast cancer and the poor treatment she has received at BoP, a longer sentence would be greater than necessary to serve those purposes. As such, the applicable § 3553(a) factors support Ms. Beck's request for compassionate release.

**d. The Government's Opposition to Release**

The Government opposes Ms. Beck's request for compassionate release on several grounds. First, the Government suggested at oral argument that Ms. **Beck** will receive better medical care going forward because her case now has BoP's attention and certain appointments have now been (belatedly) scheduled, apparently in response to Ms. Beck's civil suit. Even assuming Ms. Beck's treatment has improved of late,15 there is nothing to suggest--much less to guarantee--that this recent deviation from the past trend**{2019 U.S. Dist. LEXIS 33}** of inadequate care will continue. The fact that it has recently promptly scheduled appointments as required by a court order does not prove it will continue to provide appropriate care without court oversight. *See* Civil Doc. 40; Civil Doc. 47. Moreover, as noted in *supra* Section III(a), BoP continues to justify delays by blaming non-BOP officials, such as her oncologist, and logistical issues, and it has provided erroneous information about her recent appointments to the Court. The quality of Ms. Beck's cancer treatment at BoP in the past remains the best predictor of what it will be in the future. *See supra* note 9.

Second, the Government relies on the fact that BoP doctors have reviewed Ms. Beck's administrative request for compassionate release and determined that she does not qualify. Doc. 521 at 6-7. But BoP's conclusion that Ms. Beck's condition is not severe enough to warrant release is entitled to little, if any, deference. For one, BoP's internal criteria for assessing when compassionate release is appropriate are stricter than U.S.S.G. § 1B1.13 and the application note.16 *See McGraw*, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488, at *3-4 (noting the BoP doctor's conclusion "does not reflect the standard set forth in the Application Notes" and conducting**{2019 U.S. Dist. LEXIS 34}** a *de novo* analysis of whether the defendant's medical condition qualified as extraordinary and compelling). The BoP physician who reviewed Ms. Beck's request for a compassionate release motion did not consider whether, as suggested in her records, she has metastatic solid-form cancer, which is specifically listed as an example of a terminal illness in the old application note. U.S.S.G. § 1B1.13, application note 1(A)(i).17

Moreover, the terms of the First Step Act give courts independent authority to grant motions for compassionate release and says nothing about deference to BoP, thus establishing that Congress wants courts to take a *de novo* look at compassionate release motions. As noted *supra*, before 2018, courts could only grant compassionate release upon motion of BoP, and BoP's decision not to file such motions was unreviewable. That changed with The First Step Act, which removed sole responsibility from BoP and authorized courts to consider motions of inmates who had tried and failed to convince BOP to move on their behalf.

Finally, the Government contends that Ms. **Beck** may present a danger to the community given the seriousness of her offenses and the fact that**{2019 U.S. Dist. LEXIS 35}** she would be released into Surry County, where the drug conspiracy took place. Doc. 521 at 5 n.1. But of the co-conspirators with whom she most closely associated, the more culpable, including her husband, are still incarcerated and will remain in prison for several more years.18 Ms. Beck's substantial assistance is public knowledge, which also diminishes the risk others will attempt to involve her in new criminal activity. And, as noted *supra*, the conditions of supervised release will limit her ability to engage in

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

criminal conduct without swift detection.

**IV. Conclusion**

Ms. **Beck** committed serious drug and firearms offenses with her husband in 2012 and 2013 that warrant substantial punishment. She has served over six years of her sentence, nearly two of them with breast cancer treated so untimely as to significantly reduce her chances of survival. Ms. Beck's invasive cancer and the abysmal health care BoP has provided qualify as "extraordinary and compelling reasons" warranting a reduction in her sentence to time served. *See* 18 U.S.C. 3582(c)(1)(A)(i). While the old policy statement is not directly applicable to motions filed by defendants, a reduction is consistent with its general guidance and the Sentencing{2019 **U.S. Dist. LEXIS 36**} Commission's intent. With appropriate supervision, Ms. **Beck** poses little risk of recidivism or danger to the community. She has already served an arduous sentence, and the § 3553 factors support a sentence reduction. As such, Ms. **Beck** is entitled to compassionate release.

It is **ORDERED** that the defendant's motion for a sentence reduction based on compassionate release, Doc. 494, is **GRANTED**. Her sentence will be reduced to time served, with supervised release for 5 years to follow on terms previously imposed and as supplemented with additional terms as stated in this order. This sentence will be stayed for twenty-one days to give BoP time to implement it and to give the Probation Office time to evaluate Ms. Beck's proposed residence. Judgment will be entered separately. The Clerk shall provide a copy of this Order to the Probation Office

This the 28th day of June, 2019.

/s/ Catherine C. Eagles

**UNITED** STATES DISTRICT JUDGE

**Footnotes**

1

Citations to documents filed on the docket of Ms. Beck's civil case will be cited as "Civil Doc. #," and citations to medical records contained in exhibits filed in her civil case and incorporated in filings in this criminal case will be to the date of the appointment and provider name, with the bates pagination in brackets.

2

For simplicity here and elsewhere, the Court cites the declaration of Dr. Karen Winkfield, who reviewed Ms. Beck's medical records, for many facts relevant to Ms. Beck's treatment history, but the Court confirmed her history by reviewing the underlying medical records.

3

BoP refers to the June appointment as an "initial visit" with a surgeon to examine the new right breast masses and to schedule an appointment for a biopsy at a later date. Civil Doc. 29 at ¶ 8. BoP states that the surgeon "will not conduct a biopsy during an initial visit," *id.*, but Ms. Beck saw the surgeon about her right breast masses in March, 03/27/2019--Bilton [USA Bilton 3-4], so the June visit was a "follow-up." Civil Doc. 13 at ¶ 5; *see also* 05/11/2019--Ortiz [BOP 323] (recommendation of BoP official to "refer back to surgery").

4

For a discussion of the history of compassionate release in the federal system before the First Step

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Act, see William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 Md. L. Rev. 850, 859-70 (2009).
5

Specifically, courts may now consider motions for compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); *see also* First Step Act of 2018, Pub. L. 115-391, Title VI § 603, 132 Stat. 5194 (Dec. 21, 2018).
6

The other statutory possibility concerns age and sentence length requirements that Ms. Beck clearly does not meet. *See* § 3582(c)(1)(A)(ii). The Court will not discuss them further.
7

As the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to motions brought by defendants in the near future. The Commission consists of seven voting members and requires four for a quorum to amend the guidelines. 28 U.S.C. §§ 991(a), 994(a). As of the second quarter of fiscal year 2019, the Commission has only two voting members. U.S. Sentencing Comm'n, *Annual Report* 2-3, 2018, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report.pdf .
8

District courts have taken varying approaches to the old policy statement in evaluating compassionate release motions filed by defendants under the First Step Act. Many courts have, without discussion, applied the old policy statement. *See, e.g., United States v. Heromin*, No. 8:11-cr-550-T-33SPF, 2019 U.S. Dist. LEXIS 96520, 2019 WL 2411311, at *1-2 (M.D. Fla. June 7, 2019); *United States v. Willis*, No. 15-cr-3764 WJ, 382 F. Supp. 3d 1185, 2019 U.S. Dist. LEXIS 95783, 2019 WL 2403192, at *2 (D.N.M. June 7, 2019); *Gross*, 2019 U.S. Dist. LEXIS 97933, 2019 WL 2437463, at *2-3. At least one court has held that courts cannot "disregard" the old policy statement and order compassionate release without finding extraordinary and compelling circumstances. *See United States v. Overcash*, No. 3:15-CR-263-FDW-1, 2019 U.S. Dist. LEXIS 57354, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019). Another court has suggested that the old policy statement still applies and that courts cannot grant compassionate release for reasons other than those listed in subdivisions A through C of the application note. *See United States v. Shields*, No. 12-cr-00410-BLF-1, 2019 U.S. Dist. LEXIS 93574, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019). Yet another court disagrees with *Shields* and has ordered release for extraordinary and compelling reasons other than those enumerated in the application note. *See Cantu*, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, at *5.
9

As the Government often argues in criminal cases, "past behavior best predicts future behavior." *United States v. Paulino*, 335 F. Supp. 3d 600, 614 (S.D.N.Y. 2018) (citations and quotations omitted); *see also* William Faulkner, Requiem for a Nun 73 (1s Vintage Int'l ed. 2011) ("The past is never dead. It's not even past."); William Shakespeare, The Tempest, act II, scene I (1611) ("What's past is prologue.").
10

It appears undisputed that Ms. Beck's doctors have diagnosed her with this form of cancer. *See, e.g.,*

1ydcases                                        13

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

11/02/2018--Bilton [Page 18, Doc. #10] ("Post op diagnosis: Left breast cancer"); 11/01/2018--Bilton [BOP 252] (noting "metastatic cancer" in the left breast); 11/06/2018--Bilton [Page 34, Doc. #12] (noting "metastatic carcinoma" in two nodes); 02/12/2019--Hunter-Buskey [BOP 276] ("postop stage 2B - invasive lobular carcinoma left breast"); 04/03/2019--Evans [BOP 310] ("Primary diagnosis: T2N1aM0 left breast cancer"). While the record is not explicit as to whether her condition still meets this definition post-operatively, compare{*2019 U.S. Dist. LEXIS 23*} 02/12/2019--Hunter-Buskey [BOP 276] ("postop stage 2B - invasive lobular carcinoma left breast"), *with* 03/11/2019--Griffin [BOP 290] (post-op imaging suggests there is "[n]o evidence of recurrent or metastatic disease."), BoP points to no evidence of a physician finding that she is cancer-free and its own doctor appears to acknowledge that she still has cancer. Doc. 521-1 at 5. She is at high risk for recurrence and may have new tumors in her right breast, and the poor medical care is contributing to the severity of her medical condition.
11

Specifically, in 2016, the Commission noted that "[w]hile only the Director of the Bureau of Prisons has the statutory authority to file a motion for compassionate release, the Commission finds that the court is in a unique position to assess whether the circumstances exist." U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 3, Apr. 28, 2016 (internal quotations omitted); *see also* U.S.S.G. § 1B1.13, application note 4.
12

Federal offenders with Ms. Beck's acceptance of responsibility, age (47 now, 42 at sentencing), and final offense level (34), *see* Doc. 429-1 at 3, 18, have a relatively low rate of recidivism. *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 20-21, 23, Mar. 2016, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf ; U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, Dec. 2017, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf . While offenders with her criminal history score (2) and category (II), Doc. 429-1 at 20, recidivate at a somewhat higher rate, the rate is still relatively low compared to offenders with a more extensive criminal history. *See Id.* at 18-19.
13

U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders Receiving Retroactive Sentence Reductions: The 2011 Fair Sentencing Act Guideline Amendment*, Mar. 2018, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180328_Recidivism_FSA-Retroactivity.pdf .
14

U.S. Dep't of Justice, *The Federal Bureau of Prisons' Compassionate Release Program* iv, Apr. 2013, *available at* https://oig.justice.gov/reports/2013/e1306.pdf .
15

*See* Civil Doc. 23 at 2 (describing an error in the declaration of a BoP physician assistant who stated Ms. Beck had a surgery consultation scheduled before the end of May, which the Court relied on in crafting a TRO, but which turned out not to be true),
16

*Compare, e.g.*, Doc. 522-1 at 5 (letter from the Warden, noting the BoP will only move for compassionate release "in *particularly* extraordinary or compelling circumstances" (emphasis added)), *and* Doc. 521-1 at 5 (BoP's reduction in sentence form, asking, *inter alia*, whether the

1ydcases                                                                    14

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

inmate has a "life expectancy [of] eighteen (18) months or less"), *with* 18 U.S.C. § 3582(c)(1)(A) (simply requiring "extraordinary and compelling reasons"), *and* U.S.S.G. § 1B1.13, application note 1(A)(i) (noting that a "specific prognosis of life expectancy . . . is not required").

17

BOP's other criteria are tailored to separate provisions of the old policy statement addressing debilitating, rather than terminal, medical conditions. *See* U.S.S.G. § 1B1.13, application note 1(A)(ii); Dep't of Justice, Program Statement 5050.50(3)(b), Jan. 17, 2019, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf (listing these criteria under the "Debilitated Medical Condition" section of BOP's compassionate release criteria). Because those provisions have no arguable applicability, the Court need not address them.

18

In 2013, Mr. Beck received a sentence of 195 months imprisonment, Doc. 276 at 2, which was later reduced to 171 months based on a retroactive guideline amendment. Doc. 440. Johnny Ray Bowman received a sentence of 135 months and is still in prison. Doc. 273. The other co-defendants with whom she was primarily associated, *see* Doc. 192, were mostly addicts without firearm charges who received shorter sentences. *See* Docs. 244, 245, 246, 266, 281 (reduced at 419), 304, 305 (revoked at 519), 306.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

YOU AND YOU ALONE HAVE MY HEALTH AND FUTURE
HEALTH (ALONG WITH MANY OTHERS) IN YOUR HANDS.

THANK YOU - YOUR HONOR, FOR TAKING THE TIME TO
READ THIS MEMO AND SHARING Additional Environmental Conditions
INFORMATION FOR MY MOTION OF Compassionate RELEASE.

Respectfully,

Jimmy McWhorter
INMATE #51518-039

4

Personal Memorandum in Support                6-10-20
of Jimmy McWherter's Motion of
Compassionate Release

Your Honor,

　　　I am writing this Personal letter to inform you
of Additional medical situations that I have been and
currently being exposed to while being incarcerated within
the Bureau of Prisons (BOP).

　　　I am currently residing at the Federal Correctional
Camp located in Loretto or "FCC Loretto." Loretto Federal
Camp is a small Camp located in a remote town of Cresson, Pa.
Due to the current Covid-19 Pandemic - both the Camp
and FCI Low have been locked down with absolutely
no visits from family/friends since 1 March 2020 to our
current date and with no plans of relinquishing such
incarceration priviledges until a vaccine/medical solution
is tested and in place. (administered) I have not seen
my wife of 15 years and my young children since before
Christmas 2019 (bad weather) and have been informed
"unofficially" by Loretto's administration that "this"
Prison will not be allowing visits until a vaccine
or antidote is available. (Approximately 12-18 months according
to national news media). I am totally in agreement and
understanding with BOP Loretto's Policies as such because
Loretto is one of the few institutions that do not have
any reported cases of Covid-19.

　　　Lets examine that situation - Your Honor! As a
Prudent individual, it seems hard to comprehend that there
is no Covid-19 cases when this institution has not and
is not testing anyone - inmate or Correction Officer
alike or even testing a cross section of the current

1

POPULATION TO ACCURATELY DETERMINE AND SUPPORT THAT
PUBLIC POSITION. AS WE ALL KNOW, INMATES AND BOP
EMPLOYEES CAN BE A-SYMPTOMATIC AND SHOW NO SIGNS/SYMPTOMS
OF THE VIRUS BUT CAN CARRY AND SPREAD. THIS PARTICULAR INSTITUTION
HAS NOT AND DOES NOT HAVE A CDC REGIMENTED POLICY OF
WEARING MASKS, GLOVES - DAILY INSPECTIONS AND TEMPERATURE READINGS.
A "MCDONALDS" HAS STRICTER AND REQUIRED CDC POLICIES IN PLACE
WHERE INDIVIDUALS VISIT INFREQUENTLY AND STAY FOR SHORT PERIODS
OF TIME - COMPARED TO 24 HOURS / 7 DAYS A WEEK EXPOSURE TO
EACH OTHER AND BOP PERSONNEL.

IN THE BEGINNING OF COVID-19, CORRECTION OFFICERS (CO)
AND MEDICAL PERSONNEL WEREN'T EVEN DONNING PROTECTIVE MASKS.
IT WASN'T UNTIL THE COURTS GOT INVOLVED DID THIS INSTITUTION
"START" TO COMPLY WITH CDC GUIDELINES. WITHIN THE LAST 4-6
WEEKS THE PRISON POPULATION HAS BEEN PROVIDED DISPOSABLE PAPER
MASKS (LIFE SPAN 8 HOURS) AND A CLOTH MASK (MANUFACTURED
BY UNICOR) THAT ARE IMPOSSIBLE TO DON AND SHRINK WHEN WASHED
AND DRIED. THEY EXPECT THE PAPER MASKS TO LAST 7 DAYS OF
EVERY WAKING HOUR OF USE.

ANOTHER MAJOR CONCERN IN THIS CAMP AND IN ALL CAMPS
IS "SOCIAL DISTANCING". WE ARE NOT CONFINED TO CELLS OR
RESTRICTED CUBICLES AS IN LOW AND MEDIUM FACILITIES. OUR CAMP
CAPACITY IS APPROXIMATELY 126-140 INMATES IN A "HOSPITAL WARD"
TYPE ENVIRONMENT FOR SLEEPING - BUNK BEDS 3 FEET APART
AND IMPOSSIBLE TO "SOCIAL DISTANCE". WE EAT NEXT TO EACH OTHER,
RECREATION NEXT TO EACH OTHER - AND SLEEP NEXT TO EACH OTHER. A
VIRUS FUZE READY TO IGNITE. ONCE AG BARR'S MEMO CAME OUT -
THE BOP STARTED TO REDUCE ITS POPULATION HERE - WITH NO
CONCERN ON SOCIAL DISTANCE BUT ONLY TO COMPLY WITH
AG BARR'S MEMO. A LOT OF INMATES WERE SCHEDULED
TO BE RELEASED TO HOME CONFINEMENT BUT WITH THE

Arbitrary and Capricious Policy of 50% of Sentence served - A lot of inmates both health and with chronic conditions were removed from the list and informed of "No release".

As for this memo - How did AG Barr's memo go from focusing on release based upon health conditions to 50% of sentence served / 25% - 18 months remaining to the door" become the solution to the Covid-19 Pandemic. Inmates have have been released that still have 4-6 years remaining on their sentence and with no health conditions while highly vulnerable inmates of suffering from Covid -19 are still here.

On top of all othis - We are not given any disinfecting soap/hand sanitizer or proper sanitizing solutions to clean/disinfect our sleeping quarters / eating area and showering environments. No bleach or hand sanitizer has never been provided by the BOP. We can purchase hand sanitizer on our commissary but thats at the inmates expense and ALWAYS subject to availability. The BOP does spray with normal disinfectant about once a week - door-handles but it not where such is truely needed. All these activities of safeguard and prevention is just a "dog and pony" show.

'Why am I telling you all these minor infractions? They all add up to creating a petri dish or pandemic environment for myself the other inmates and all that reside at this BOP. These situations and incarceration environment exposes myself and many others - to support my compassion release motion (request) along with the many other release motions. Your honor, please, TAKE this type of institutional environment and supporting activities into considering your decision on my release motion along with the many others that are before you awaiting a decision rendering.



**PRIORITY MAIL**

FROM:

no postmark

51518-038
Jimmy Mcwherter
Fed ID #51518-038
Federal Correctional Institution
P.O. Box 1000
Cresson, PA 16630
United States

RECEIVED
JUL 17 2020
CLERK'S OFFICE
U.S. DISTRICT COURT

TO:

51518-039
Clerk Of Court
Hon. Judith E. Levy
231 W Lafayette BLVD
Theodore Levin Courthouse
Detroit, MI 48226
United States

USPS TRACKING NUMBER

9505 5158 4586 0163 2210 35

EXPECTED DELIVERY DAY: 06/15/20